UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ANTONIO L. GREEN,

               Plaintiff,

v.

                                        Case No. 3:20-cv-1204-MMH-MCR

J. ZUELKE, et al.,

               Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Antonio L. Green, an inmate of the Florida penal system, initiated this action on September 30, 2020, by filing a pro se Verified Complaint for Money Damages and Declaratory Relief (Complaint; Doc. 1) with exhibits (Docs. 1-1 through 1-7).[1] In the Complaint, Green asserts claims pursuant to 42 U.S.C. § 1983 (related to a September 17, 2019 incident involving the use of force at New River Correctional Institution (NRCI)) against Defendants Sergeant J. Zuelke, Captain M.J. Strong, Sergeant J.

_____

[1] In referencing documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

Strickland, and Officer Barnes.[2] As relief, Green requests compensatory and punitive damages as well as injunctive and declaratory relief.

This matter is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 40). They submitted exhibits in support of the Motion. See Docs. 40-1 through 40-9; 53-1; S-48; S-56. The Court advised Green of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 6); Summary Judgment Notice (Doc. 42). Green filed a response in opposition to the Motion. See Brief in Opposition to Defendants' Summary Judgment Motion (Response; Doc. 50); Declaration in Opposition to Defendants' Motion for Summary Judgment (Green Decl.; Doc. 51); Statement of Disputed Factual Issues (Green Statement; Doc. 52). The Motion is ripe for review.

## II. Plaintiff's Allegations[3]

As count one, Green asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when Zuelke

---

[2] The Court dismissed Green's claims against Defendant Dye. See Order (Doc. 38).

[3] The recited facts are drawn from the Complaint.

2

used excessive force against Green as he was lying face down on the floor with his hands restrained behind his back. Complaint at 11. As count two, he contends that Strong, Strickland, and Barnes failed to intervene to stop Zuelke's excessive use of force. Id. As to the specific underlying facts, Green alleges that Florida Department of Corrections (FDOC) staff assigned him to work in food service at NRCI. Id. at 3. According to Green, on September 17, 2019, Zuelke and Barnes approached the chow hall table where Green (seated and talking with two other inmates) was eating his evening meal and "ordered [him] to cuff up." Id. at 4. Green states that he stood and permitted Zuelke to handcuff him. Id. He asserts that Zuelke escorted him towards the exit door, as Green tried to speak with Officer Dye. Id.

According to Green, Zuelke "intentionally push[ed]/shove[d] [him] causing him to fall to the floor while in handcuffs." Id. He states that Zuelke put his right knee in Green's back "for no apparent reason" and applied "all of his body weight" under Green's right shoulder. Id. Green avers that he screamed "in pain" and yelled for help, as Barnes and Dye watched from three to six feet away. Id. at 5. Green believes that Zuelke's use of excessive force lasted five to ten minutes. Id. He asserts that Strong and Strickland responded to the incident "moments later." Id. He states that Zuelke told him to "shut the

f-ck up and stop yelling muthf-cker." Id. Green alleges that he "continued yelling and screaming." Id. at 6.

Green maintains that when an unknown officer entered the dining hall and directed Green to stand, Green told him that he needed help standing. Id. According to Green, when the unknown officer instructed Zuelke to help him lift Green to a standing position, Zuelke "finally" moved off of Green's back. Id. He avers that Strong directed Strickland and the unknown officer to escort Green to the medical clinic. Id. Green states that he tried to walk to the medical clinic until his back pain was so "unbearable" that he sat down on the ground and asked for a wheelchair. Id. He alleges that another officer arrived on the scene with a handheld camera. Id. According to Green, Strong was "very upset and angry" when he noticed Green seated on the ground, and told Strickland and the unknown officer that Green "don't run sh-t, drag his f-ck ass to medical." Id. at 7. He asserts that Strickland and the other officer forcefully picked him up off the ground by his arm, causing more pain to his right shoulder, and escorted him to the medical clinic. Id.

Green states that he affirmed to an unknown white female nurse that force was used against him and told her about the "extreme pain" in his back and shoulder. Id. According to Green, Strong whispered in the nurse's ear twice, and she responded, "I'll do whatever you want me to do," and "he's good

to go." Id. at 8. He asserts that the nurse did not examine his back or right shoulder. Id. Green maintains that he declared a psychological emergency and threatened to hang himself upon "first chance." Id. He states that Strickland and the unknown officer took him to a confinement wing holding cell. Id.

Green asserts that, several hours later, he saw Nurse Sandidge regarding the self-declared psychological emergency. Id. According to Green, Sandidge examined Green's back and right shoulder, told Green that he did not have any Ibuprofen to give him, and advised Green to submit a sick-call request "to see a doctor and receive pain medication." Id. at 9. He also avers that Sandidge advised Captain Hilliard that Green needed to be placed in a self-harm observation status (SHOS). Id. He asserts that the FDOC transferred him to an SHOS cell at Florida State Prison where the next day (September 18th) he talked about his suicidal thoughts with a psychologist. Id. at 10. He states that the FDOC released him from SHOS and returned him to NRCI that same day. Id. Green maintains that Nurse Stephens saw him in the sick-call clinic on September 20th and gave him Ibuprofen and a pain-relieving muscle-rub cream. Id. He maintains that Stephens did not refer him to a doctor and told Green that he did not need x-rays. Id.

5

## III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)

(citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motion, Defendants maintain that the Court should grant summary judgment in their favor as to Green's Eighth Amendment claims against them. See generally Motion. They argue that the video evidence supports Defendants' position that Zuelke used minimal force to obtain Green's compliance with verbal orders, and that Barnes, Strong, and Strickland "cannot be liable under § 1983 for failure to intervene in [a] non-violation." Id. at 6-10. They also assert that they are entitled to qualified immunity. Id. at 14-15. Additionally, Defendants contend that Green is not entitled to compensatory damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injury resulting from Defendants' acts and/or omissions. Id. at 10. And, they argue that Green is not entitled to injunctive and declaratory relief. Id. at 11-14. In his Response, Green maintains that there remain genuine issues of material facts that preclude summary judgment in Defendants' favor as to his Eighth Amendment claims against them. See Response at 6-23.

## V. Applicable Law

### A. Excessive Use of Force and Failure to Intervene

In <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force" claims. In doing so, the Court instructed:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5, 112 S. Ct. 995, 117 L.Ed.2d 156 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs based on the type of Eighth Amendment violation alleged. <u>Id.</u>
>
> Since [the plaintiff] asserts excessive-force . . . claims, "the core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Wilkins</u>, 559 U.S. at 37, 130 S.Ct. 1175 (citation and quotation marks omitted).[5] This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." <u>Hudson</u>, 503 U.S. at 8, 112 S.Ct. 995 (cleaned up).

---

[5] <u>Wilkins v. Gaddy</u>, 559 U.S. 34 (2010) (per curiam).

With respect to the subjective element, "to have a valid claim on the merits of excessive force in violation of [the Eighth Amendment], the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, 112 S.Ct. 995, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37, 130 S. Ct. 1175. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 37-38, 130 S. Ct. 1175. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." Wilkins, 559 U.S. at 37, 130 S.Ct. 1175 (citation and internal quotation marks omitted).

Id. at 1265-66; see also McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). In determining whether an officer's use of force was applied maliciously and sadistically for the purpose of causing harm, courts consider five distinct factors:

10

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986); Hudson, 503 U.S. at 7). When considering these factors, courts "must also give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)).

Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry. Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (per curiam); Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam). The United States Supreme Court has explained:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[6] (quoting Whitley, supra, at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a '"push or shove"' that causes no discernible injury almost certainly fails to

---

[6] Hudson, 503 U.S. at 7.

state a valid excessive force claim. Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[7]

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38. The Eleventh Circuit has stated:

> A plaintiff who suffers only de minimis injury does not necessarily lack a claim for excessive force under § 1983. Stephens,[8] 852 F.3d at 1328 n.33; Saunders v. Duke, 766 F.3d 1262, 1270 (11th Cir. 2014). However, the resulting injuries can be evidence of the kind or degree of force that was used by the officer. See Crocker v. Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021).

Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021).

As a separate matter, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000); Alston v. Swarbrick, 954 F.3d 1312, 1321 (11th Cir. 2020); Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). This liability, however, only arises when the officer is in a position to intervene

---

7 See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

8 Stephens v. DeGiovanni, 852 F.3d 1298 (11th Cir. 2017).

and fails to do so. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010); see also Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011); Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010) ("Because the relevant events happened so quickly, the record does not reflect any point at which [the officer] could have intervened to prevent [another officer's] use of excessive force . . . .").

### B. Qualified Immunity

As to the doctrine of qualified immunity, the Eleventh Circuit has explained:

> Government officials acting in their discretionary duties are entitled to qualified immunity from individual capacity suits. Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002). Qualified immunity protects them from suit unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> "To establish the defense of qualified immunity, the burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Vinyard v. Wilson, 311

13

F.3d 1340, 1346 (11th Cir. 2002) (quoting <u>Lee</u>, 284 F.3d at 1194).

Whether governmental officials are entitled to qualified immunity at summary judgment entails a two-part inquiry. <u>Dukes v. Deaton</u>, 852 F.3d 1035, 1042 (11th Cir. 2017). "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" <u>District of Columbia v. Wesby</u>, – U.S. –, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018) (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable officer would understand that what he is doing' is unlawful." <u>Id.</u> (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Hope</u>, 536 U.S. at 739, 122 S.Ct. 2508 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987)). The essential question here is whether the officer had "fair warning" that his actions were unconstitutional. <u>See</u> <u>Willingham v. Loughnan</u>, 321 F.3d 1299, 1301 (11th Cir. 2003).

<u>Charles</u>, 18 F.4th at 698; <u>see also</u> <u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017). The court has instructed:

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled

14

to an independent qualified immunity analysis as it relates to his or her actions and omissions. So[,] we must be careful to evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged.

Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018).

## VI. Analysis[9]

## A. Eighth Amendment Claims

Green contends that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. He asserts that Zuelke used excessive force against him when Zuelke escorted Green towards the chow hall exit door and pinned him to the floor on September 17, 2019. He also states that Defendants Strong, Strickland, and Barnes failed to intervene to stop Zuelke's use of excessive force. Defendants contend that they are entitled to summary judgment as to Green's Eighth Amendment claims against them. In support of their position, Defendants submitted exhibits, including the Declaration of Joshua Zuelke (Zuelke Decl.), Doc. 40-1; the Declaration of Rufus Barnes (Barnes Decl.), Doc. 40-2; the Declaration of Joseph Strickland (Strickland Decl.), Doc. 40-3; the Declaration of Maurice Strong (Strong Decl.),

---

[9] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Green. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

15

Doc. 40-4; the Report of Force Used, Doc. 40-5; the MINS[10] Report, Doc. 40-6;

Green's medical records, Doc. 40-9; and the Deposition of Antonio Green (P.

Depo.), Doc. 53-1. With the Court's permission, see Order (Doc. 44), Defendants

also submitted two digital video discs under seal. See Docs. S-48, handheld

(HH) video; S-56, fixed wing (FW) video.

In his Declaration, Defendant Zuelke describes his role in the events of

September 17, 2019. He states in pertinent part:

> At approximately 6:37 p.m., on September 17, 2019, while assigned as C-Dormitory Housing Sergeant, I was supervising the evening meal in food service. While attempting to escort Inmate Green to medical for a pre-confinement physical, Inmate Green suddenly threw himself to the floor of the dining hall declaring a psychological emergency[,] refusing all orders to cease his actions and[] to [] stand to his feet. To prevent self-injury and overcome Inmate Green's physical resistance to lawful commands, physical force became necessary. I utilized my body weight and pinned Inmate Green's upper torso to the ground while giving him verbal orders to cease his actions and stand to his feet so that he could be escorted to medical for assessment. Inmate Green complied with [the] order and no further force was utilized by me.
>
> Inmate Green was escorted to medical by Sergeant Tracy Borra and Sergeant Joseph Strickland who utilized an arm lock, due to Inmate Green repeatedly dropping his body weight.

---

[10] The abbreviation or acronym "MINS" is not defined in the documents provided to the Court. Apparently, these reports are generated for the use of corrections officials and the Inspector General's Office after a use of force upon an inmate or a battery upon a correctional officer by an inmate.

16

Zuelke Decl. at 1 (enumeration and selected spacing omitted). In his Declaration, Defendant Barnes, who was also supervising inmates, describes what he saw in the chow hall that night, stating in pertinent part:

> At approximately 6:37 p.m., on September 17, 2019, while assigned as B Dormitory Housing Sergeant[,] I was supervising the evening meal in Food Service. During this time, Sergeant Zuelke was attempting to escort Inmate Green to medical for a pre-confinement physical. Inmate Green then threw himself on the floor of the dining hall and declared a psychological emergency, refusing all orders to stand to his feet and walk. Force then became necessary to prevent self-injury and overcome Inmate Green's physical resistance to lawful commands. I then witnessed Sergeant Zuelke use his body weight to pin Inmate Green's upper torso to the floor. I then witnessed Sergeant Strickland and Sergeant Borra use a shoulder lock technique to escort Inmate Green to medical and confinement, due to Inmate Green repeatedly dropping his weight as he walked. Inmate Green then became compliant[,] and all force ceased.

Barnes Decl. at 1 (enumeration omitted). Next, Defendants Strickland and Strong explain their roles when they responded to the incident. In a Declaration, Strickland states in pertinent part:

> At approximately 6:37 p.m., on September 17, 2019, I was supervising the medication window and responded to an ICS [(Incident Command System)] incident in food service. Upon arrival to the dining hall, I witnessed Sergeant Zuelke utilize his body weight to pin Inmate Green's upper torso to the ground to prevent harm. I utilized a shoulder lock technique to assist Sergeant Borra in escorting Inmate Green to

17

> medical due to Inmate Green's repeatedly dropping his
> weight as he walked. Sergeant Borra and I then
> escorted Inmate Green to G-dorm and secured Inmate
> Green in the confinement cell.

Strickland Decl. at 1 (enumeration omitted). In a Declaration, Defendant
Strong provides a similar account of what he saw when he arrived at the chow
hall. Strong Decl. at 1.

To defeat the Motion, Green is required to present evidence to show that
there is a genuine issue for trial. In opposing Defendants' Motion, Green
asserts that Defendants are not entitled to summary judgment. He submitted
the Declarations of two inmates who allegedly saw the incident, Doc. 51-1, as
well as his own Declaration, in support of his contentions. He also submitted
his handwritten statement, dated September 19, 2019, Doc. 51-3; the
Diagrams of Injury, dated September 17, 2019, Doc. 51-4; the Back Pain
Protocol, dated September 23, 2019, Doc. 51-5; emergency room records, dated
September 17, 2019, Doc. 51-6; Health Information Transfer/Arrival
Summary, dated September 17, 2019, Doc. 51-7; the Report of Force Used, Doc.
51-8; and "FDC Violate Their Fiduciary Duties," Doc. 51-9. Green maintains
that Defendants' assertions that Zuelke did not use excessive force against
Green "is not true by far, and can be verified by the chow hall food service
video" because "camera[]s don't lie." Green Decl. at 2.

18

In a Declaration, Green provides a factual account that is similar to the allegations in his Complaint. He states in pertinent part:

> Defendant Zuelke can clearly be seen on the din[]ing hall video surveillance intentionally using excessive force against the plaintiff when he pushed/shoved the plaintiff while he was in double locked handcuffs behind his back as the plaintiff was attempting to speak with officer S. Dye who was assigned as food service security on September 17, 2019, to better understand why he was being taken to confinement and for what reason, causing the plaintiff to lose his footing while falling face down on the din[]ing hall floor resulting in both physical injuries as well as mental and emotional distress as evidence[d] in [his exhibits].

Id. at 4. He states that Zuelke used "his 250 plus pound body weight to physically pin down the 172 pound plaintiff's upper torso to the ground." Id. at 5. Green asserts that he yelled, screamed, and declared a psychological emergency because he had "difficulties breathing" and feared "being murder[ed] alive. Id. at 5, 9. According to Green, Defendants Strong, Barnes, and Strickland "all watched silently with an opportunity to intervene . . . but failed to do so." Id. at 9. Green provided a similar account in his September 19, 2019 witness statement. Doc. 51-3. Additionally, at his deposition, Green maintained that Zuelke used excessive force when Green had complied with his directives, and that Strong, Barnes, and Strickland failed to intervene to stop Zuelke's use of excessive force. See generally P. Depo. Also, in support of

19

Green's version of the facts, Inmates Santos McGill (FDOC #W01203) and Leon Chappell (FDOC #593084), who allegedly were seated with Green when Zuelke approached the table to handcuff Green, provided factual accounts similar to each other and Green. Doc. 51-1.

The parties agree that the fixed wing video (no audio) evidence captures the September 17, 2019 use of force. They generally cite to the fixed wing video footage and argue that the video evidence supports their own factual accounts as to how the events unfolded. See Motion at 7-9; Green's Decl. Notably, the fixed wing camera angle pointed directly towards the chow hall's entry/exit door, displaying approximately thirty four-seat tables while cutting off from its view some tables located at a greater distance from the door. See FW video. The video shows inmates finishing their dinners, disposing of their trash, and exiting the dining hall. Id. The first several minutes of the video are uneventful, as the number of inmates slowly dwindles leading up to the handcuffing and use of force at issue. Id. The video evidence shows that officers approached the far end of the chow hall towards the table where Green and other inmates sat. Id. Because the video surveillance camera pointed towards the door, the area where Zuelke handcuffed Green is off camera. Id. Nevertheless, while the handcuffing captured the attention of bystanders who remained in the chow hall, id., it is undisputed that Green submitted to

20

handcuffing without physical resistance, P. Depo. at 12-13. The handcuffing event is not at issue.

The video evidence captures Zuelke as he escorted Green towards the exit door for a pre-confinement physical. Id. Zuelke held the right arm of Green, who is handcuffed behind his back, as Barnes followed. Id. During the escort, Zuelke guided Green and dodged tables along the way, as they headed towards the door. Id. The video evidence displays that Zuelke chose a path that avoided other individuals, id. including Officer Dye, who was the officer in charge of the chow hall that night, P. Depo. at 19. The video evidence also shows that Green used his feet to brace himself when he passed Officer Dye, FW video, because he wanted to ask her why they were escorting him to confinement, P. Depo. at 18. The video captures the cross-over positioning of Green's feet and upward tilt of his head in Dye's direction, FW video, evidencing Green's attempt to interact with Dye, which he admits. In his deposition, Green explained what transpired:

> They used hand restraints and they escorted me out the chow hall. He [was] pulling me. And I got on these Crocs[,] and I lose my footing and I fall on the floor.
>
> . . . .
>
> I'm saying as I'm walking -- the dining hall area is not tile like this, it's some other tile, it's always slippery, always wet, regardless of what kind of shoes

21

you wear, regardless. You have to take your time to walk inside the chow hall. You can't be trying to walk fast or cut – dragging or pulling, you got to take your time. You got Crocs -- Crocs have no kind of grip whatsoever.

So[,] as I'm trying to walk -- but I'm asking the officer who is assigned to the chow hall [(Officer Dye)], why am I being put in confinement.

. . . .

As I'm walking out the chow hall, I'm talking to Dye. So[,] I guess he don't want me to talk to her so he's trying to hurry up and get me out of there. That's my take on it. I'm walking -- I'm trying to take my time, taking baby steps. But if you being pulled and you ain't got no control of your balance, you ain't got no choice but to fall. You can't stop the fall, you can't break the fall. Nothing -- I caught the edge of the table and I hit my head on something, on the edge of the bench. Luckily I caught that part.

P. Depo. at 13, 18, 48-49. The video shows Green's fall. FW video. It also shows that Zuelke did not push or shove Green onto the floor. Id. Instead, as Green testified in his deposition, Zuelke may have hurried Green past Dye to shorten their verbal encounter, and Green may have lost his footing. P. Depo. at 48-49. But regardless of whether Green fell to the ground of his own volition or because he tripped, the video shows that he fell and was not pushed or shoved to the ground by Zuelke. Indeed, the video shows that as Green fell, Zuelke, who was upright and holding onto Green's upper right arm, was pulled downward by Green. FW video at 18:37:59.

22

It is undisputed that Zuelke used his body weight and pinned Green's upper torso to the ground, as he directed Green to stand to his feet for an escort to the medical clinic. P. Depo. at 13-14; Zuelke Decl.; Barnes Decl.; Strickland Decl.; Strong Decl. The video evidence captures Green on the ground and Zuelke on top of him. FW video. There is no audio, however, Green admits that he screamed, yelled, and declared a psychological emergency while he remained on the floor. Green Decl. at 5, 9. The rapid circular motion of the ceiling-fan blades and an officer briefly block the camera's view. Nevertheless, the parties agree that Zuelke pinned Green to the floor. The video evidence shows that Green was on the floor for about four minutes. FW video. Zuelke was not on top of Green the entire time, but instead knelt beside Green for most of the time, as he waited for other officers to help lift Green to his feet. Id.

The parties agree that Defendant Strickland and Officer Borra escorted Green to the medical clinic and the holding cell in the confinement wing.[11] Green Decl. at 11, 13; Strickland Decl.; Strong Decl.; HH video (with audio).[12] The video evidence shows that Strickland and Borra first escorted Green to the

---

[11] The video shows Borra's name stitched on his brown cap, and Strickland's name printed on his uniform shirt. HH video.

[12] Defendant Strong announced that the camera malfunctioned when they were leaving the chow hall. HH video.

medical clinic where the female clinician checked his vital signs and lifted his shirt to examine his back. HH video. Green remained in the clinic for approximately five minutes (6:57 p.m. arrival and 7:02 p.m. departure). <u>Id.</u> During Green's brief stay in the clinic and on the way to the G dormitory holding cell, he proclaimed that the camera shows what happened, expressed suicidal thoughts, and adamantly voiced his version of the facts. <u>Id.</u>

According to Green, he suffered a contusion on the right shoulder blade, lower back pain, and wrist swelling and redness. P. Depo. at 50. The MINS report states that "Green received two post use of force physicals with no injuries noted on the first[,] and a contusion to the right posterior shoulder blade was noted on the second [physical]." Doc. 40-6 at 2 (capitalization omitted). The medical records submitted by both parties show that Nurse T. Muriell examined Green in the medical clinic at 6:57 p.m. and recorded "no visible injuries." Docs. 40-9 at 25; 51-4 at 3; <u>see</u> <u>also</u> Doc. 40-5 at 6. According to the emergency room record, "no treatment [was] indicated," and the nurse advised Green that he could request a sick-call visit if the back pain "persists or worsens." Doc. 40-9 at 22. After Strickland and Borra used a shoulder-lock technique to escort Green to confinement, <u>see</u> Strickland Decl.; Strong Decl., Nurse Fox noted a contusion to Green's right posterior shoulder blade during a medical assessment that same evening at 8:30 p.m. Docs. 40-9 at 23-24; 51-4

24

at 2; see also Doc. 40-5 at 6. According to Green's medical records, the FDOC placed Green in SHOS with an assigned medical grade 1 (routine care) and mental health grade 3 (moderate impairment in adaptive functioning due to a diagnosed mental disorder),[13] and Celexa and Vistaril for depression and anxiety. Doc. 40-9 at 11-13; see Complaint at 9. On September 20, 2019, Green requested a sick-call appointment for his back pain, and asked for x-rays and pain medication. Docs. 40-9 at 8; 51-5 at 2. According to Green, Nurse Stephens saw him in the sick-call clinic on September 20th and gave him Ibuprofen and a pain-relieving muscle-rub cream, and told him he did not need x-rays. Complaint at 9.

The video evidence is reliable and provides a chronology of how the incident unfolded. Undoubtedly, there was a rapidly-evolving physical incident involving Zuelke and Green. What began as a routine escort for a pre-confinement medical assessment swiftly morphed into an escalated event that required the assistance of personnel to address Green's psychological needs. The video does not show Zuelke using excessive force upon Green. Nor, does it show any unjustified actions. Rather, it depicts Green falling to the floor, and Zuelke pinning him to the ground, as he waited for other officers to arrive to

---

[13] See http://dc.state.fl.us/business/Health/bulletin.html, Health Services Bulletin, 15.03.13, "Assignment of Health Classification Grades to Inmates."

help lift Green to his feet for an escort. Green maintains that he declared a psychological emergency, and therefore, it was paramount that Zuelke and the escorting officers take the necessary actions to prevent self-injury and transport Green for psychological evaluation. The record shows that Green was placed in SHOS that same night. Complaint at 9; Doc. 40-9 at 13.

Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to their Declarations, medical records, and the video evidence, that appropriate and minimal force was used against Green. Thus, Green is required to present evidence to show that there is a genuine issue for trial; he has not done so. If this case were to proceed to trial, Green would have only his testimony and inmates McGill and Chappell to support his assertions. Nevertheless, Green acknowledges that the fixed wing video recorded what transpired, and it shows that some force was necessary to stabilize the situation and control an unruly inmate,[14] and only minimal force was used. Zuelke's pinning of Green to the floor was the least forceful way to gain control of the situation and advance the escort to the medical clinic. Given the fact that the video evidence and the exhibits submitted by Defendants support their description of the incident, the contrary

---

[14] See P. Depo. at 62 ("I declared [a] psychological emergency."); id. at 63 ("I'm yelling and screaming the whole time.").

account presented by Green, McGill, and Chappell fails to create a genuine issue for trial. <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The evidence reflects that, under the circumstances, the pinning of Green to the floor was necessary, and only minimal force was used until other officers arrived at the scene to take over the escort.

Notably, the minor injury serves as evidence that Zuelke did not use excessive force.[15] <u>See</u> <u>Charles</u>, 18 F.4th at 700 ("The injuries attributable to [the officer]'s tackle were minor. The small scrapes, bumps, and bruises suffered from the tackle are entirely consistent with a routine takedown."). The record simply does not support an inference of wantonness in the infliction of pain. The parties agree that Zuelke pinned Green to the floor and the fixed wing video evidence displays what transpired. The Court finds that summary judgment in Defendant Zuelke's favor is appropriate because no reasonable jury could find that Zuelke violated Green's Eighth Amendment right. <u>Scott</u>,

---

[15] <u>See</u> Doc. 51-3 (describing the injury as a bruise); P. Depo. at 59 (stating that the treatment was Ibuprofen, a muscle cream, and Tylenol).

550 U.S. at 380. As such, Defendants' Motion is due to be granted as to Green's Eighth Amendment claim against Defendant Zuelke.

Additionally, Defendants Barnes, Strong, and Strickland assert that they are entitled to summary judgment as to Green's Eighth Amendment failure-to-intervene claims against them. Motion at 9-10. They argue that Zuelke's force upon Green was neither excessive nor a violation of the Constitution, and therefore they "cannot be held liable under § 1983 for failure to intervene in that non-violation." Id. at 10. The Court agrees. Because there is no Eighth Amendment excessive-use-of-force violation as to Defendant Zuelke, Defendants' Motion is due to be granted as to Green's Eighth Amendment failure-to-intervene claims against Barnes, Strong, and Strickland. See Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]"); Sanders v. City of Union Springs, 207 F. App'x 960, 966 (11th Cir. 2006) ("[G]iven that the plaintiffs are unable to establish a constitutional violation, their claim for failure to intervene must fail."); Butler v. Sec'y, Fla. Dept. of Corr., No. 20-11097, 2021 WL 4279555, at *4 n.4 (11th Cir. Sept. 21, 2021) (per curiam) ("Because the officers did not use excessive force, [the plaintiff] also cannot maintain a failure-to-intervene claim against [the defendant].").

## B. Qualified Immunity

Defendants assert that they are entitled to qualified immunity because they did not commit any federal statutory or constitutional violation. <u>See</u> Motion at 14-15. Under the doctrine of qualified immunity, a defendant may be protected from claims for monetary damages against him in his individual capacity. Here, it is undisputed that Defendants were engaged in discretionary functions during the events at issue. Thus, to defeat qualified immunity with respect to each Defendant, Green must show both that the specific Defendant committed a constitutional violation, and that the constitutional right violated was clearly established at the time. Indeed, the Eleventh Circuit has instructed that, in determining the applicability of qualified immunity, the Court must "parse" the actions each Defendant undertook, and "address the evidence as it pertains solely to" that defendant. <u>Alcocer</u>, 906 F.3d at 952. Upon review of the record and the parties' arguments as well as parsing the actions of each Defendant, <u>see</u> FW video; HH video, the Court finds that Defendants are entitled to qualified immunity from monetary damages in their individual capacities as to Green's Eighth Amendment claims against them.

## C. Plaintiff's Newly-Asserted Claims

In response to Defendants' Motion, Green describes a "second excessive use of force" by Defendant Strickland and Officer Borra when they escorted

him. Response at 9, 23; Green Decl. at 13, 19; Green Statement at 5, ¶ 16. However, in his deposition, he reasserted that he holds Strickland liable because he failed to intervene to stop Zuelke's excessive use of force. P. Depo. at 52-53. Green also stated that his classification officer tried to transfer him to another institution due to the retaliation he experienced at NRCI. Id. at 56-57. Insofar as Green asserts a retaliation claim against Defendants and/or excessive-use-of-force claims against Defendant Strickland and Officer Borra in his response to Defendants' summary judgment motion, the Court determines that raising new legal claims against Defendants and Officer Borra for the first time at this stage of the litigation is impermissible. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot."). Thus, the Court determines that Green is not permitted to pursue his new claims against Defendants and Officer Borra in this case.

In consideration of the foregoing, it is now

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED**.

2. The Clerk shall enter judgment in favor of Defendants, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of April, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-1 4/19
c:
Antonio L. Green, #981309
Counsel of Record

31